# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**BOBBIE L. COMPTON,**

    **Plaintiff,**

    **v.**
                                   **Case No. 25-CV-1294-SCD**

**FRANK J. BISIGNANO,**
  *Commissioner of the Social Security Administration,*

    **Defendant.**

---

## DECISION AND ORDER REVERSING THE COMMISSIONER'S DECISION

---

Bobbie Compton seeks social security benefits based on an unusual combination of physical and mental impairments. After a hearing, an administrative law judge denied the claim for benefits, finding that, although Compton had "moderate" limitations in concentrating, persisting, or maintaining pace—CPP in social security lexicon—she could perform a range of unskilled, light work. Compton sought judicial review, and the district court reversed the ALJ's decision because the assessed residual functional capacity did not incorporate all of Compton's mental limitations supported by the record.

On judicial remand, an ALJ again denied the claim for benefits and again found that Compton was capable of unskilled work. The ALJ added a few words, but he never explained how the new mental RFC cured the deficiencies of the last one—namely, how he accounted for all of Compton's difficulties with sustained concentration and persistence. Without that explanation, the decision lacks a logical bridge from the evidence to the ALJ's conclusion that the assessed restrictions adequately addressed Compton's moderate limitations in

concentration, persistence, and pace. I will therefore reverse the decision denying Compton disability benefits and remand the matter for further proceedings.

## BACKGROUND

In 2017, Compton applied for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, claiming that she was unable to work due to various physical and mental impairments. *See* R. 172, 370–80.[1]

### I.      Vocational and Medical History

Compton was born in 1979, and she grew up in Northeastern Wisconsin. R. 3448. After graduating from high school, she worked for many years in the manufacturing industry. *See* R. 72–79, 350–69, 374–76, 392–400. In August 2017, Compton injured her neck and right shoulder at work. R. 623–24. (Compton is right-handed. R. 71.) She participated in physical therapy and returned to work on light duty. *See* R. 608–24. However, Compton left her manufacturing job when that light-duty work quickly dried up and her employer was unable to accommodate her restrictions. *See* R. 76–79, 374.

Compton says she wouldn't have been able to work much longer anyway because her other medical conditions were worsening as well. *See* R. 79–80. She had type 1 diabetes, which she struggled to control, and for years she saw a neurologist, Celeste Case, for suspected narcolepsy and sleep paralysis. *See* R. 551–52, 637–43, 647–50. Compton told Dr. Case that she fell asleep during the day, including sometimes while at work, though generally she was able to maintain wakefulness if she remained active physically and mentally. A sleep study failed to confirm narcolepsy or sleep paralysis; rather, the sleep medicine specialist believed that Compton's hypersomnia was related to underlying depression and that her episodes of

---

[1] The transcript is filed on the docket at ECF No. 11-1 through ECF No. 11-3.

2

paralysis were suggestive of conversion disorder. R. 550–55, 583–86. She recommended psychiatric care and counseling. Despite complaining about brain fog, difficulty concentrating, and memory loss, Compton didn't follow through with the sleep specialist's recommendation. *See* R. 602–08, 1525–26. She did, however, attend another sleep study and was diagnosed with idiopathic hypersomnia. R. 1289–1300.

Meanwhile, Compton continued to complain about pain in her shoulder and neck and dystonia[2] in her hands. *See* R. 1301–21. An MRI of the shoulder was normal, but a cervical spine MRI revealed a large central disc herniation at C6-7, with significant central canal stenosis and bilateral foraminal narrowing. R. 597–602, 655–59, 704–09, 787. In April 2018, Compton underwent a C5-C7 anterior cervical discectomy and fusion. *See* R. 792–829. She reported significant improvement in shoulder and neck pain at her post-op appointments. *See* R. 948–55.

As part of her ongoing worker's comp case, Compton also sought treatment from Michael Fitzgerald, an occupation medicine physician. *See* R. 1322–27. Because she continued to demonstrate ongoing shoulder impingement upon examination, in October 2018, Dr. Fitzgerald limited Compton to occasionally lifting ten pounds with her right arm, frequently lifting two pounds with her right arm, rarely reaching above the shoulder, and occasionally reaching forward. Dr. Fitzgerald later made those restrictions permanent and assessed a 5% permanent partial disability rating at the right shoulder. R. 1514–20.

Dr. Case eventually referred Compton to a different neurologist, Anne Josiah, for evaluation of seizures and memory issues. *See* R. 1090–97. Compton told Dr. Josiah at the

---

[2] "Dystonia is a disorder characterized by involuntary muscle contractions that cause slow repetitive movements or abnormal postures." R. 1771 (citing https://www.ninds.nih.gov/dystonias-fact-sheet).

initial consultation in October 2018 that she had been suffering from sleep paralysis for the last ten to twelve years. She said she often woke up unable to talk or move for hours. She also reported times when she was awake and talking but had no memory of events, episodes of convulsions that she felt were seizures, difficulty word-finding, and dystonia in her hands and feet. Upon examination, Compton exhibited a normal mental status and an intact memory. Dr. Josiah indicated that Compton's memory problems were likely compounded by difficulty with concentration due to anxiety and depression related to her health concerns. She ordered epileptic monitoring and advised Compton to keep track of all seizure episodes.

Compton was admitted for EEG monitoring in January 2019. *See* R. 1098–1152. The monitoring also included a neuropsychological evaluation by Jana Jones. R. 1104–06. Compton told Dr. Jones that, for the last few years, she struggled with word finding, forgetfulness, and concentrating, and it was getting worse. She said she was independent with her daily activities, but she had difficulties with medication management and managing her finances, she rarely drove out of fear of injuring someone, and she never went shopping alone. During the evaluation, Compton demonstrated a constricted affect and possible fatigue and psychomotor slowing. Her intellectual functioning was borderline, and she exhibited impaired learning, memory, language, processing speed, and executive functioning. Dr. Jones strongly recommended that Compton participate in psychotherapy, consult with psychiatry, and seek out a diabetes clinic. After several days of monitoring, Compton was discharged with a normal EEG. R. 1099–1100.

Compton did not heed Dr. Jones's advice. Instead, she followed up with Dr. Case in October 2019. *See* R. 1438–44. Compton told Dr. Case that she continued to have seizure-like episodes, periods of morning paralysis, and dystonic activity in her hands and feet. Dr. Case

4

recommended that Compton pursue counseling, seek psychiatric care, and keep a journal of her episodes. In August 2020, Compton's disability lawyer asked Dr. Case to complete a medical source statement in favor of Compton's disability application. R. 1469. Dr. Case agreed but said that she would first need to see Compton again and that Compton would need to undergo a functional capacity evaluation.

Compton was evaluated by Jerad Arendt the following month. *See* R. 1510–13. Based on her performance with testing, Arendt indicated that Compton could never perform overhead work, could occasionally perform bent-over work, and could occasionally reach "at weight." R. 1512.[3] Arendt opined that, overall, Compton was capable of medium work for an eight-hour day.

In October 2020, Compton followed up with Dr. Case. *See* R. 2603–07. She reported increased seizures—which she attributed to low blood sugar—but said her episodes of morning paralysis were not as severe or prolonged as they had been in the past. She also reported increased memory concerns and more difficulty concentrating. However, she still had not pursued counseling or psychiatric care. Dr. Case again encouraged Compton to seek psychotherapy and a psychiatrist, ordered a repeat neuropsychiatric test, and advised Compton to keep a diary of her episodes of seizures and paralysis.

Compton presented for the neuropsychological evaluation about a week later. *See* R. 2589–94. The findings of that evaluation were generally consistent with previous neuropsychic eval. Compton was diagnosed with generalized anxiety, major depressive disorder, and, provisionally, functional neurological symptom disorder. And she was again strongly encouraged to pursue psychotherapy.

---

[3] The functional capacity summary report defined "occasionally" as up to one-third of the day. R. 1512.

Compton did not return to Dr. Case until March 2022. *See* R. 2940–46. At that time, she reported improvement of nocturnal seizures. She said that she had been having seizures about every four to six weeks throughout 2021 and that her last seizure was in December. Compton also reported no episodes of morning paralysis since early 2021, though she still had difficulty managing her insulin, she continued to experience daytime somnolence, and she had the same memory concerns. Dr. Case continued Compton's medications and encouraged her to keep a diary of her different episodes.

In January 2023, Compton had a consultative psychological examination with Deirdre Radosevich. *See* R. 3448–50. She told Dr. Radosevich that she felt useless, that her physical conditions exacerbated her depression and anxiety, that she constantly felt tired no matter how much she slept, that she had impaired concentration, and that her physical activities were quite limited. Dr. Radosevich noted that Compton frequently yawned and appeared tired throughout the exam. Compton exhibited good immediate recall, had no difficulty following the conversation, was able to discuss current events and engage in abstract thinking, and demonstrated good insight and judgment. However, she struggled a bit with delayed recall. Dr. Radosevich diagnosed major depressive disorder and indicated that Compton had moderate limitations understanding, remembering, and carrying out simple instructions; no limitations responding appropriately to supervisors and co-workers; marked limitations maintaining concentration, attention, and work pace; moderate limitations withstanding routine work stressors; and a marked limitation adapting to change.

## II.    Administrative Review

Compton applied for disability benefits in October 2017. *See* R. 172. She alleged that she became disabled on September 5, 2017 (when she was thirty-eight years old), due to type

diabetes, narcolepsy, cervical spinal stenosis, and depression. *See* R. 370–80. In her application materials, Compton asserted that narcolepsy and hypersomnolence disorder resulted in constant tiredness, falling asleep while working, loss of use of her hands, forgetfulness, memory loss, and loss of concentration. *See* R. 382–91. She said she often woke up paralyzed for eight to ten hours, unable to move anything but her eyes. Compton reported difficulties with most activities and claimed her impairments affected her ability to lift, squat, bend, stand, reach, walk, kneel, talk, climb stairs, remember, complete tasks, concentrate, understand, use her hands, and get along with others. She said she could pay attention for only a couple of minutes, she didn't finish what she started, and she struggled following instructions.

The state agency charged with reviewing disability applications on behalf of the Social Security Administration denied Compton's claim during its initial review of the medical records. *See* R. 105–32. The reviewing physician found that Compton retained the ability to perform light exertional work with certain postural, manipulative, and environmental restrictions. R. 109–10, 112–14, 123–24, 126–28. The reviewing psychological consultant, Frank Orosz, found that Compton's depression and somatic symptom disorder caused "moderate" limitations in concentration, persistence, and maintaining pace.[4] R. 109–11, 114–16, 123–25, 128–30. Dr. Orosz indicated on the mental residual functional capacity form that Compton was moderately limited in her ability to maintain attention and concentration for extended periods. In the narrative section of that form, Dr. Orosz stated that Compton "may have moderate difficulty concentrating for extended periods of time, maintaining work pace,

---

[4] A moderate limitation means the claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is fair." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(2)(c).

7

and completing a normal workday/week [without] interruptions from her psych[-]based [symptoms]." R. 116, 130. He explained that Compton's underlying depression and preoccupation with her somatic symptoms were affecting her ability to concentrate. Ultimately, Dr. Orosz found Compton limited to "unskilled" work.[5]

Compton requested the state agency to reconsider its denial. *See* R. 203–07. She claimed that she was having seizures and waking up paralyzed more regularly and said that she was unable to care for herself when that happened. *See* R. 403–10. Compton reported that she could pay attention for only two or three seconds, that she didn't finish what she started, and that she struggled with spoken instructions. *See* R. 425–39.

The state agency upheld the denial of Compton's claim upon her request for reconsideration. *See* R. 133–64. The reviewing consultants largely agreed with the findings at the initial level of review. *See* R. 138–46, 154–62. However, upon reconsideration, reviewing psychologist Ellen Rozenfeld found that Compton was also moderately limited in her ability to carry out detailed instructions, though her narrative explanation mirrored that of Dr. Orosz. R. 144–46, 160–62.

After the state-agency denial, Compton had a hearing with an ALJ. *See* R. 64–104. She told the ALJ that she couldn't work anymore due to mental health issues, seizures, type 1 diabetes, and a sleep disorder. R. 79–82. She said she had frequent seizures, including sometimes when her blood sugar wasn't even low, and she often woke up paralyzed and unable to move for several hours. R. 89–94. Compton indicated that, while sometimes she

---

[5] "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. §§ 404.1568(a), 416.968(a).

had seizures several days a week, other times she could go two weeks without having one. She also reported difficulties remembering, concentrating, and staying focused.

In June 2019, the ALJ issued a decision finding that Compton was not disabled. *See* R. 169–92. However, the Social Security Administration's Appeals Council vacated that decision and sent the case back to the ALJ for rehearing. *See* R. 193–97. Compton testified at the second hearing that she still had pain in her right shoulder, that she didn't reach overheard, and that she could lift only five pounds with her right arm. R. 46–47. She also continued to experience daily fatigue, unpredictable seizures, and temporary paralysis. R. 47–55. In March 2021, the ALJ issued another unfavorable decision. *See* R. 11–38, 1734–61. In reaching that decision, the ALJ determined that Compton was mentally limited to (1) simple, routine, and repetitive tasks with no more than simple instructions; and (2) low-stress work, which the ALJ defined as jobs with no inflexible or fast-paced production requirements, involving only simple work-related decision making, and few, if any, changes in work setting. R. 20. The Appeals Council subsequently denied Compton's request for review, *see* R. 1–6, 1762–67, making the ALJ's 2021 decision a final decision of the Commissioner of the Social Security Administration, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016).

Compton then sought judicial review under 42 U.S.C. § 405(g). *See* R. 1802–05. United States District Judge Lynn Adelman reversed the Commissioner's 2021 decision, finding that the ALJ erred in assessing Compton's mental RFC. *See* R. 1768–1800. Specifically, Judge Adelman determined that the ALJ failed to account for the reviewing psychologists' findings that Compton was moderately limited in her ability to maintain attention and concentration for extended periods. R. 1792–96. Judge Adelman held that limiting Compton to simple, low-stress work was insufficient and that the psychologists' narrative findings that Compton was

limited to unskilled work did not account for all the limitations they assessed on the MRFC form. Judge Adelman further held that the ALJ's error was not harmless, as Compton had identified a limitation—in her ability to maintain attention and concentration for extended periods—that could be included in the RFC on remand. He noted that, on remand, the ALJ should consider whether Compton's well-documented cognitive decline required greater limitations. The Appeals Council vacated the ALJ's 2021 decision and remanded the claim to a different ALJ for further proceedings consistent with the court's order. R. 1808–13.

Meanwhile, Compton filed a new DIB claim. *See* R. 1814–23. Dr. Orosz reviewed the updated medical records but still assessed a moderate limitation in Compton's ability to concentrate, persist, and maintain pace. R. 1816–17. He found that Compton was moderately limited in three subcategories of sustained concentration and persistence: the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods R. 1820–211. In the narrative section of the MRFC form, Dr. Orosz stated that Compton could sustain performance of simple two- to three-step tasks for eight hours per day and a typical forty-hour workweek provided standard breaks for rest and lunch.

In October 2023, Compton had another administrative hearing. *See* R. 1699–1733. She told the new ALJ that her medical conditions hadn't changed since the last hearing in January 2021. R. 1712. Her shoulder issues were a little better, but she didn't lift or carry heavy objects. R. 1715–16. Compton said her biggest issues were diabetes, narcolepsy, and back pain. R. 1717–18. She indicated that she needed constant supervision in case she didn't wake up

when her blood sugar fell too low. Compton said she spent most of the day sleeping, but she was able to take care of her dog and perform light yardwork. R. 1713–15. A vocational expert also testified at the hearing. *See* R. 1718–32. The vocational expert testified that a hypothetical person with Compton's age and vocational profile could still work if she were limited to a restricted range of light exertional work. R. 1721–24. According to the vocational expert, the mental limitations the ALJ included in his hypothetical adequately addressed a moderate CPP limitation and would not preclude any of the jobs the expert offered. R. 1724–27.

The ALJ conducted a follow-up hearing in May 2024. *See* R. 1678–98. Compton confirmed that her medical conditions remained pretty much the same. R. 1685. The vocational expert testified that a hypothetical person with Compton's age and vocational profile could work as a housekeeping cleaner, a marker, and a routing clerk if she were limited to a restricted range of light exertional work, including never reaching overhead with the right (dominant) upper extremity and frequent reaching in other directions with that extremity. R. 1688–90. The hypothetical also included several mental limitations: only simple, occasional decision making; few, if any, changes in the work setting; and no production rate or pace work such as on an assembly line and with no specific hourly production quotas, but variable-based tasks and end-of-day production quotas were permissible. When asked if the jobs he identified could be performed by someone who has a "slightly below average ability to sustain concentration, persistence and pace for two hours at a time," the vocational expert responded, "Yes, I believe it could." R. 1692. The ALJ overruled Compton's objection to that question. *See* R. 1690–95.

In July 2024, the ALJ issued a written decision finding that Compton was not disabled. *See* R. 1638–77. The ALJ considered the disability applications under 20 C.F.R. §§ 404.1520

11

and 416.920, which set forth a five-step process for evaluating DIB and SSI claims. *See* R. 1641–64. Relevant here, the ALJ determined at step two of that process that Compton had six severe impairments: degenerative disc disease of the cervical and lumbar spine, right (dominant) shoulder impingement, idiopathic hypersomnia, conversion disorder, depression, and anxiety. R. 1644–45. The ALJ determined at step three that Compton did not have an impairment, or a combination of impairments, that met or medically equaled the severity of a presumptively disabling impairment listed in the social security regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1 (i.e., "the listings"). R. 1645–48. In making that determination, the ALJ agreed with the reviewing state-agency psychologists that Compton had a moderate limitation in concentrating, persisting, or maintaining pace. R. 1647.

Between steps three and four, the ALJ assessed Compton's residual functional capacity—that is, the most she could do despite her physical and mental limitations, *see* 20 C.F.R. §§ 404.1545(a), 416.945(a). The ALJ determined that Compton had the RFC to perform a restricted range of light work. R. 1648. According to the ALJ, Compton could never reach overhead with her dominant right upper extremity but could frequently reach in other directions. The ALJ also assessed several mental limitations. Specifically, the ALJ limited Compton to understanding, remembering, and carrying out no more than simple instructions; performing simple, routine tasks; jobs having only occasional, simple decision making and few, if any, changes in the work setting; and jobs with "no production rate or pace work such as an assembly line with no specific hourly production quotas, but variably paced tasks and end-of-day production quotas are permissible." R. 1648. In assessing that RFC, the ALJ considered Compton's subjective allegations, the objective medical evidence, and the medical opinion evidence. *See* R. 1648–62.

12

The ALJ determined that Compton's statements concerning the intensity, persistence, and limiting effects of her symptoms were inconsistent with the overall record. The ALJ first summarized Compton's allegations, observing that she claimed she was unable to work due primarily to seizures, hypersomnolence, and difficulty concentrating. *See* R. 1649. The ALJ then summarized the objective medical evidence, noting that Compton suffered from degenerative disc disease, a right shoulder impingement, idiopathic hypersomnia, conversion disorder, depression, and anxiety. *See* R. 1649–57. However, the ALJ identified several inconsistencies in Compton's allegations regarding daytime sleepiness, alleged difficulty with medication management, and her work history. R. 1657. The ALJ also found that Compton's medications helped more than she alleged, noting documented improvement in cognitive functioning and other mental symptoms. R. 1656–57. And the ALJ observed that Compton repeatedly failed to follow through with recommendations to pursue psychiatric care and to keep a diary of her seizure episodes. R. 1657.

According to the ALJ, the prior administrative medical findings of the reviewing state-agency consultants also supported the assessed RFC. *See* R. 1659–61. The ALJ found generally persuasive the mental health findings Dr. Orosz and Dr. Rozenfeld made concerning Compton's initial claim, explaining that the assessed mental RFC accounted for potential, intermittent, temporary lapses in concentration, persistence, and pace. R. 1660–61. The ALJ acknowledged Judge Adelman's decision and said he addressed those concerns by confirming with the vocational expert that the assessed limitations sufficiently accommodated Compton's moderate CPP limitations. R. 1661. The ALJ noted that he attempted to quantify the term "moderate" for the vocational expert as a "fair"—that is, a slightly below average—ability to sustain concentration, persistence, and pace for two hours at a time. The ALJ indicated he

13

was unsure how to fashion a limitation with any greater degree of specificity. The ALJ also generally credited Dr. Orosz's findings concerning Compton's more recent disability claim. R. 1661–62. However, he rejected Dr. Orosz's assessed limitation to two- to three-step tasks, finding it vague and not vocationally relevant.

The ALJ then continued with the sequential evaluation process. The ALJ determined at step four that Compton did not have any past relevant work. R. 1662. At step five, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Compton could still perform. *See* R. 1662–63. The ALJ, relying on the vocational expert's testimony, listed three representative jobs: housekeeping cleaner, marker, and routing clerk. Based on the step-five finding, the ALJ determined that Compton had not been disabled at any time from her alleged onset date (September 5, 2017) through the date of the ALJ's decision (July 5, 2024). R. 1663–64.

The ALJ's 2024 decision became the final decision of the Commissioner after remand because the Appeals Council overruled Compton's written exceptions and declined to assume jurisdiction over the case, R. 1631–37. *See* 20 C.F.R. §§ 404.955, 404.974, 416.1455, and 416.1484. This action followed. *See* Compl., ECF No. 1.

## LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, modify, or reverse the Commissioner's decision, with or without remanding the matter for a rehearing. A reviewing court will reverse the Commissioner's decision "only if the ALJ based the denial of benefits on incorrect legal standards or less than

substantial evidence." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).

"Substantial evidence is not a demanding requirement. It means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Martin*, 950 F.3d at 373 (quoting *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019)). "When reviewing the record, this court may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, the court must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)).

## DISCUSSION

Compton seeks remand for rehearing, arguing that substantial evidence does not support the ALJ's step-five finding that she could adjust to other work in the national economy. She raises three issues, but I find that the first one warrants remand. According to Compton, the ALJ erred in evaluating her mental limitations.[6]

The ALJ determined at step three that Compton had a moderate limitation in concentrating, persisting, or maintaining pace. R. 1647. In making that determination, the ALJ relied on the prior administrative medical findings of Dr. Orosz and Dr. Rozenfeld, the reviewing state-agency psychological consultants who found that Compton had moderate

---

[6] All parties have consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 6 & 8.

difficulties with sustained concentration and persistence. R. 1647 (citing Exhibits 1A–4A; 18A), R. 1660–61 (citing Exhibits 1A; 2A). The ALJ said he accommodated Compton's temporary CPP lapses, occasional psychomotor slowing, and tired presentation by restricting her to work involving (1) the ability to understand, remember, and carry out no more than simple instructions; (2) the performance of only simple, routine tasks in an environment requiring only occasional decision making and few, if any, changes; and (3) no production rate or pace work (such as on an assembly line). R. 1648, 1657, 1661.

Compton argues that the assessed RFC fails to account for all her medically supported mental limitations. She accuses the ALJ of repeating the same error as the last ALJ: he credited the reviewing psychologists' moderate finding in the broad functional area of concentrating, persisting, and maintaining pace, but he failed to include all the psychologists' assessed limitations in the hypothetical posed to the vocational expert and the RFC or explain why they were omitted. Specifically, Compton says the ALJ failed to account for her moderate limitation in the ability to maintain attention and concentration for extended periods. *See* Pl.'s Br., at 6–10, ECF No. 12.[7]

The Seventh Circuit has repeatedly emphasized "that 'both the hypothetical posed to the [vocational expert] and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record,' including even moderate limitations in concentration, persistence, or pace." *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019) (quoting *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015)). "The best way to do that is by including the specific limitations—like CPP—in the hypothetical." *Id.* (citing *Moreno v. Berryhill*, 882 F.3d

---

[7] Citations are to the pages numbers on Compton's brief, not those provided by the court's electronic filing system.

16

722, 730 (7th Cir. 2018)). However, "there is no magic words requirement." *Id.* Reviewing courts "will let stand 'an ALJ's hypothetical omitting the terms concentration, persistence, and pace when it [is] manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform.'" *Kuykendoll v. Saul*, 801 F. App'x 433, 438 (7th Cir. 2020) (quoting *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010)).

The ALJ in this case did not adequately account for all Compton's moderate limitations in concentration, persistence, and pace in a manner consistent with Seventh Circuit precedent. The assessed mental RFC largely mirrors the RFC that Judge Adelman previously found deficient. *Compare* R. 1648 (limiting Compton to simple, routine tasks; no more than simple instructions; simple decision making; and few, if any, changes in work setting) *with* R. 1743 (same). The only difference concerns production quotas. The last ALJ limited Compton to "no inflexible or fast paced production requirements." R. 1743. In the most recent decision, the ALJ limits Compton to "work where there is no production rate or pace work such as an assembly line with no specific hourly production quotas, but variably paced tasks and end-of-day production quotas are permissible." R. 1648. As Judge Adelman has already explained, *see* R. 1792–93, the Seventh Circuit has "previously rejected similar formulations of a claimant's limitations because there is no basis to suggest that eliminating jobs with strict production quotas or a fast pace may serve as a proxy for including a moderate limitation on concentration, persistence, and pace," *DeCamp v. Berryhill*, 916 F.3d 671, 675–

17

76 (7th Cir. 2019) (citing *Moreno*, 882 F.3d at 730; *O'Connor-Spinner v. Colvin*, 832 F.3d 690, 698 (7th Cir. 2016)).[8]

The Seventh Circuit has recognized three exceptions to the general rule that catch-all terms, like the ones the ALJ used here, do not sufficiently account for problems of concentration, persistence, or pace. First, "an ALJ may reasonably rely upon the opinion of a medical expert who translates these findings into an RFC determination." *Burmester v. Berryhill*, 920 F.3d 507, 511 (7th Cir. 2019) (citing *Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002)). Second, an ALJ may specifically explain "how an alternately phrased RFC accounted for each of the individual claimant's CPP limitations." *Moyer v. Kijakazi*, No. 22-C-1202, 2023 WL 5215380, 2023 U.S. Dist. LEXIS 143307, at \*33 (E.D. Wis. July 18, 2023) (citing *Martin*, 950 F.3d at 374). Finally, an ALJ may assess context-specific limitations that are likely to trigger the claimant's symptoms. *See id.* at \*34 (citing *Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019)).

None of those exceptions apply here. After reviewing the medical records concerning Compton's initial claim, Dr. Orosz and Dr. Rozenfeld simply concluded that Compton was limited to unskilled work. *See* R. 114–16, 128–30, 144–46, 160–62. But as Judge Adelman has already held, *see* R. 1795, the reviewing psychologists did not explain that "translation" or account for all the specific subcategories they assessed earlier on the MRFC form.[9] *See, e.g.*, *Keck v. O'Malley*, No. 22-1716, 2024 WL 3935441, 2024 U.S. App. LEXIS 21525, at \*8 (7th

---

[8] Perhaps tellingly, while the Commissioner attempts to distinguish several of the cases Compton relies upon, he never mentions *DeCamp*—arguably the most on-point authority. *See* Def.'s Br., at 9–12, ECF No. 20.

[9] This finding distinguishes our case from *Streikus v. O'Malley*, No. 22-2484, 2024 WL 983568, 2024 U.S. App. LEXIS 5534, at \*10–14 (7th Cir. Mar. 7, 2024)—the only authority the Commissioner cites in support of his argument, *see* Def.'s Br., at 3–12—as the state-agency consultants in *Streikus* translated their checklist findings into a vocationally relevant mental RFC.

Cir. Aug. 26, 2024) ("But even if that reliance were warranted, the ALJ still needed to account for Keck's other limitations, including her moderate limitations in maintaining concentration for prolonged periods.").[10] Moreover, the ALJ explicitly rejected the narrative translation Dr. Orosz provided with respect to Compton's most recent claim. *See* R. 1661–62 (citing Exhibit 18A).

The ALJ also did not explain how the limitations he imposed accounted for Compton's specific difficulties with concentration, persistence, or pace. As the Seventh Circuit has observed in cases like *Martin* and *Jozefyk*, a cogent explanation is crucial where, as here, no medical expert has rendered specific functional limitations. The ALJ appears to agree with Dr. Orosz and Dr. Rosenfeld that Compton was moderately limited in her ability to maintain attention and concentration for extended periods. *See* R. 1660–61. However, it's unclear how a person with daytime sleepiness and temporary lapses in concentration, persistence, and pace would still be able to meet end-of-day production quotas. The ALJ did not point to any evidence in the record to suggest that Compton, despite impaired processing speed, psychomotor slowing, and demonstrated cognitive decline, "had unusual bursts of productive energy akin to a college student who pulls an all-nighter to finish a paper." *Novak v. Berryhill*, No. 15 CV 50236, 2017 WL 1163733, 2017 U.S. Dist. LEXIS 46264, at *22 (N.D. Ill. Mar. 29, 2017); *see also Thea P. v. Saul*, No. 18 C 8058, 2020 WL 2614853, 2020 U.S. Dist. LEXIS 90203, at *30–32 (N.D. Ill. May 22, 2020) ("Further, even if the ALJ had intended the elimination of strict quotas to address difficulties of concentration, persistence, or pace, it remains unclear how the ALJ decided that Plaintiff could nonetheless perform work

---

[10] The ALJ also failed to mention the psychologists' other narrative findings: that Compton may have moderate difficulties maintaining work pace and completing a normal workday/workweek without interruptions from her psych-based symptoms. *See* R. 116, 130, 146, 162.

19

measured by the amount completed by end of day."); *Dawn W. v. Berryhill*, No. 17 cv 0190, 2019 WL 2085196, 2019 U.S. Dist. LEXIS 80030, at *8–9 (N.D. Ill. May 13, 2019) ("An individual with issues concentrating, persisting, or maintaining pace may have problems meeting daily production requirements, even if they are deferred to the end of the day.").

The Commissioner insists that the ALJ sufficiently addressed Judge Adelman's concerns with the assessed mental RFC by questioning the vocational expert. *See* Def.'s Br., at 10–11 (citing R. 1661, 1690–93). At the administrative hearing following judicial remand, the vocational expert testified that the mental limitations the ALJ ultimately included in his RFC assessment—simple, routine tasks; no production rate or pace work; no specific hourly production quotas; occasional, simple decision making; and few, if any, changes in the work setting—adequately addressed a moderate CPP. *See* R. 1690–91. That testimony, however, does not answer whether the assessed limitations adequately account for *Compton's* specific difficulties with sustained concentration and persistence. *See Moy v. Bisignano*, 142 F.4th 546, 555 (7th Cir. 2025) (recognizing the broad spectrum of potential moderate limitations).

Moreover, the mental RFC the ALJ assessed does not match his questions to the vocational expert. On remand, the ALJ attempted to quantify the term "moderate," asking the vocational expert if the jobs he identified could be performed by someone with a "slightly below average ability to sustain concentration, persistence and pace for two hours at a time"; the expert said they could. R. 1692. That novel approach may be sufficient in other cases. *See, e.g.*, *Fairbank v. Kijakazi*, No. 21-C-1088, 2022 WL 4091930, 2022 U.S. Dist. LEXIS 163509, at *49–50 (E.D. Wis. June 24, 2022) ("More importantly, plaintiff provides no authority for the proposition that asking vocational experts to address the impact of 'moderate' limitations exceeds their expertise. Indeed, it appears the ALJ was trying to do what the Seventh Circuit

20

has been recommending for more than a decade."). But in our case, the ALJ did not include the two-hour concentration limitation in his RFC assessment. The Seventh Circuit has approved a similarly worded limitation, albeit in unpublished cases. *See, e.g.*, *Streikus*, 2024 U.S. App. LEXIS 5534, at \*12–13 (rejecting the plaintiff's argument that limiting him to jobs "requiring that he remain on tasks for two-hour increments" did not sufficiently account for his capabilities with focusing); *Buttles v. Kijakazi*, No. 22-2844, 2023 WL 5220913, 2023 U.S. App. LEXIS 21198, at \*9–10 (7th Cir. Aug. 15, 2023) ("But in this case, unlike in *DeCamp*, the ALJ specifically asked the vocational expert to consider jobs available to a hypothetical employee who could concentrate for only two hours at a time."). And that limitation would appear to address the ALJ's expressed—and understandable—concern about fashioning a limitation with a sufficient level of specificity.

## CONCLUSION

Because the ALJ failed to explain how the mental restrictions he assessed accounted for all of Compton's medically supported limitations, including her moderate difficulties maintaining attention and concentration for extended periods, substantial evidence does not support the ALJ's step-five finding. Accordingly, for all the foregoing reasons, I **REVERSE** the Social Security Commissioner's final decision and **REMAND** this action to the Commissioner pursuant to sentence four of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), for further proceedings consistent with this decision. On remand, the ALJ shall also ensure that all of Compton's medically supported upper-extremity limitations are accounted for and that the evaluation of Compton's subjective symptoms is logically explained and supported. The clerk of court shall enter judgment accordingly.

21

**SO ORDERED** this 12th day of June, 2026.

_____
STEPHEN C. DRIES
United States Magistrate Judge

22